# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CARLA G.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 19 C 5945** |
| | ) | |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff applied for Disability Insurance Benefits and Supplemental Security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§416(I), 423, 1381a, 1382c, almost nine years ago in July 2013. (Administrative Record (R.) 184-92). She claimed that she became disabled as of September 13, 2013, due to scoliosis back surgery and severe neck pain. Over the next three and a half years, the plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. Plaintiff filed suit under 42 U.S.C. § 405(g) on April 4, 2017. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on June 1, 2017. Just three weeks later, on June 22, 2017, the parties agreed to a remand for consideration of *inter alia* any limitations resulting from a somatoform disorder or deficiencies in concentration, persistence, or pace. (R. 983).

It was nearly two more years before the plaintiff had another administrative hearing, and, on May 22, 2019, an ALJ granted her benefits as of June 25, 2017, but not as of her alleged –

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

apparently, amended – onset date of July 4, 2012. [Dkt. #1]; (R. 862-888).[2]  So, the plaintiff filed

suit again and was back in federal district court as of September 5, 2019, seeking additional benefits

for the period before June 2017.  The parties consented to the jurisdiction of Magistrate Judge Kim

on October 18, 2019 [Dkt. ##7, 9], and the matter was fully briefed as of June 10, 2020.  After eight

months passed with no further activity, on February 11, 2021, the Executive Committee reassigned

the case to Judge Norgle under Local Rule 40.3(c). [Dkt. #27].   The parties consented to my

jurisdiction a week and a half later, and on March 10, 2021, once again, the Executive Committee

reassigned and the process began anew.  [Dkt. ##28-29].  It is the most recent ALJ's decision that

is before the court for review.  *See* 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to remand

the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

### A.

Plaintiff was born on August 4, 1964, making her 54 years old at the time of the ALJ's

decision. (R. 1103).  In 1977, at a young age, she had scoliosis surgery, and a Harrington rod was

inserted into her back from her thoracic spine to her lumbar spine.  (R. 221).  This type of surgery

has long been discontinued, as the rods themselves can later be the source of pain and other issues.

*Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015). Indeed, the plaintiff's spine appears to have

compensated below the implant, with "moderate scoliosis in the dorsal and lumbar spine with the

upper convexity toward the right, a compensatory lower convexity in the lumbar region extending

toward the left . . . ." (R. 470).  Plaintiff has been complaining of pain in her back, neck, limbs, and

---

[2] At another point, plaintiff alleges she became disabled four years later, as of February 3, 2016 (R.
1103).

2

wrists – and numbness and tingling – and seeking treatment since at least 2012. Doctors, for the most part, have been unable to help her, and they have diagnosed her with a somatoform disorder, in addition to moderate disc disease in her cervical and lumbar spines.

Despite plaintiff's scoliosis and Harrington rod implants, she has an excellent work record, working steadily for thirty years, from 1980 to 2010, with only a couple of breaks. (R. 199-200). For most of that time, she has worked in accounting. (R. 222). She stopped working in 2010 because the job was only temporary. (R. 213). She claims her condition did not become debilitating until 2012. (R. 213). When she went in to apply for disability benefits, the case manager noted that her "pain was evident" throughout the application interview. (R. 210).

The medical record in this case is large – commensurate with plaintiff's condition and quest for relief – and covers 1,507 pages. A likely monkey wrench in review of the case as it has passed through the chambers of four different judges is the fact that the Commissioner uploaded the file in 28 separate exhibits, rather than perhaps three or maybe even two. The first time this case came to federal court, the 800-plus page record was uploaded in a single filing. It's a challenge clicking through a record divided into 28 portions – the docket exhibits do not indicate record page numbers – which might be why neither side cites very much of the medical record in their briefs.

As noted, the plaintiff has a long history of scoliosis and began experiencing pain throughout her body in 2012. She was diagnosed with carpal tunnel syndrome in August 2012, and it was recommended that she wear wrist splints. (R. 310). However, claimant denied any muscle weakness or difficulty performing daily functions. (Exhibit 23F/12). An x-ray of claimant's left knee performed at that time was normal. (R. 313-14). On September 6, 2012, physical examination revealed normal muscle strength and reflexes. (R. 299). Cervical spine flexion and extension were normal, rotation

3

was 70 out of 80 degrees, and flexion was 30 out of 45 degrees. Lumbar range of motion was reduced by 10 degrees in all planes. (R. 300). Cervical spine imaging at that time showed spondylosis at C3-C4, moderate decrease of vertebral space at C5-C6, significant reversal of cervical lordosis, and a Harrington rod over the visualized T2-T6 levels. (R. 302).

Plaintiff complained of "pinching" pain in both arms and legs on December 18, 2012. (R. 404). Range of motion and strength were normal throughout. Neurological exam was normal. (R. 405). On December 27, 2012, gait was normal, neurological exam was normal, range of motion in neck and back were normal, and lab results were unremarkable. (R. 392-93). Plaintiff had an EMG on January 18, 2013, which was called "mildly abnormal," with mild left sensory median mononeuropathy (carpal tunnel syndrome) at the wrist and no electrophysiologic evidence of peripheral neuropathy. (R. 402). Results of EMG testing in on June 3, 2013, were abnormal, with electrophysiologic evidence of bilateral median mononeuropathy in the wrists, more prominent on the right side. (R. 439). In July 2013, plaintiff reported shooting pains up her arm when using a handheld device. It was noted that history of testing had been largely negative, with the exception of the June 2013 test. (R. 419). An x-ray of claimant's cervical spine showed scattered and "very minimal" degenerative changes, with chronic disc disease at C5-C6 and straightening of the lordotic curve. (R. 469). A dorsal/lumbar spine x-ray showed moderate scoliosis in the dorsal and lumbar spine with the upper convexity toward the right, a compensatory lower convexity in the lumbar region extending toward the left, and a Harrington rod extending from T1 to L2 posteriorly. (R. 470).

Plaintiff had a consultative physical examination on September 18, 2013, in connection with her application for benefits. (R. 494). Physical examination revealed pain in the low back and neck. There was full range of motion in the cervical spine, but motion was painful. Range of motion in

4

the lumbar spine was limited throughout, including to 40 of 90 degrees flexion. Range of motion was full in all joints, strength was 5/5, and gait was "fairly normal." (R. 496). On September 30, 2013, plaintiff was complaining of stabbing pains throughout her body, mostly in her hands. (R. 502). Strength, reflexes, and sensation were normal; gait was normal. (R. 504).

On September 10, 2013, Physical examination was normal. AP and lateral scoliosis x-rays showed claimant's Harrington rod to be in good position with mild to moderate degenerative changes throughout the lumbar spine and moderate degenerative disc disease at C5-C6. (R. 537). The reviewing doctor could not explain her symptoms "from [his] standpoint, emphasizing that the placement of the rods looked good, and made a referral to a neurologist. (R. 537, 539). The neurologist noted EMG evidence of neuropathy in both wrists, but could not explain plaintiff's "leg and diffuse body symptoms" as neurological exam was normal. The doctor recommended Gabapentin or amitriptyline for pain, but plaintiff deferred, not wanting to start a medication without a better understanding of the cause of her symptoms. (R. 504). Plaintiff was fitted for wrist splints, however, and pursued further treatment options, including physical therapy and holistic treatment. (R. 506, 544-55, 595-610).

On January 20, 2015, plaintiff continued to complain of pain and numbness in her extremities and significant back pain when sitting. (R. 615-16). She was then taking Gabapentin, Cyclobenzaprine, and Naproxen. (R. 616). Physical exam was again essentially normal. (R. 616). Gabapentin was discontinued, and plaintiff was prescribed Cymbalta and referred to a rheumatologist. (R. 617). On March 10, 2015, physical examination showed plaintiff to be in no acute distress, with normal ambulation and good balance, but there was mild tenderness throughout her lumbar spine. (R. 624). X-rays showed mild degenerative changes throughout the lumbar spine.

5

(R. 624). The doctor felt that plaintiff's numbness and tingling were not coming from spinal stenosis. (R. 624). The rheumatologist found no evidence of autoimmune or rheumatic disease and diagnosed claimant with polysymptomatic somatoform disorder. (R, 633).

On October 13, 2015, plaintiff was complaining of joint pain, swelling, and leg pain. (R. 669). There was edema and slight swelling in the right knee. (R. 670). Two weeks later, plaintiff was back, complaining of low back pain, neuralgia, and multiple somatic issues. (R. 673). A study revealed no evidence of DVT. (R. 677).

In October 2016, claimant was advised regarding holistic treatment options, including massage, meditation, and magnesium. On April 2017, claimant had another consultative physical examination. There was decreased sensation to pinprick and tenderness all over. There was decreased range of motion in the shoulders, cervical spine, and lumbar spine. (R. 1272). Strength was 4/5 in all limbs, and range of motion in the hips, knees, and ankles was normal. (R. 1272). Plaintiff could not tandem gait or heel/toe walk. She was able to walk 50 feet without support. (R. 1272). Grip strength was reduced to 3/5 bilaterally. (R. 1272).

Plaintiff also suffers from depression, which appears to be triggered or exacerbated by her continuing pain. Plaintiff had a consultative psychological exam on May 28, 2014. (R. 583). She was tearful and dysphoric. (R. 585). Mental status exam results were predominantly normal. (R. 584). Diagnosis was unspecified depressive disorder based on reported symptomology and preoccupation with somatic concerns and constriction in functioning. (R. 584). Plaintiff was sent for another consultative psychological examination in April 2017. She was tearful off and on during the first part of the interview. She expressed some suicidal ideation, but had no plan of action. Pain was an issue, and her memory and concentration were poor. (R. 1265). Examination revealed

6

impairment of recent memory.  (R. 1267).  Diagnosis was depression, moderate with treatment, secondary to general medical condition.

Beyond that, there are significant records of mental health treatment.  Records spanning 2014 through 2018 show plaintiff seeking treatment for her mental impairment once, twice, or even three times a week, with notes repeatedly describing her as depressed and tearful.  For example:

> November 25, 2014: mood seemed depressed; affect was tearful; thought process logical/coherent (R. 778).
>
> December 3, 2014: mood "just okay"; affect was "congruent, tearful"; thought process logical; coherent (R. 779).
>
> December 4, 2014: plaintiff unable to attend appointment due to being overwhelmed with interactions with DHS and medicare enrollment.  (R. 781).
> December 12, 2014: mood depressed; affect tearful; thought process logical; coherent (R. 782).
>
> December 19, 2014: plaintiff continued to be depressed and tearful, and asked for help in dealing with DHS and Medicaid.
>
> December 18, 2014:  plaintiff was depressed, tearful, and reserved; struggling to accept feedback and engage with people.  (R. 784).
>
> On December 19, 2014, plaintiff reported having no desire to engage with friends. Felt afraid to go out sometimes. (R.791).  She was noted to have symptoms of depression, grief, worthlessness, somatic complaints, and sleep disturbance. (R. 796).  Diagnosis of a major depressive episode, moderate.  (R. 799).
>
> On December 23, 2014, the plaintiff explained that was depressed by the adjustment she had to make to live with her scoliosis and several other health issues; frustrated with doctors who have been unable to relieve her pain; her loss of mobility robbed her of her independence; she worked since she was 17 and was no longer able to.  (R. 802).
>
> January 21, 2015: diagnosis had changed to major depressive disorder, severe and recurrent type.  GAF was 50.  (R. 807).

These notes go on in this vein, week after week, through the end of 2018 (R. 1197-1235, 1407-

1448), with plaintiff explaining that her chronic pain left her isolated from people (reminding her of childhood abuse)(R. 820); expressing fears about her future quality of life (R. 835); relating frustrations with the complexities of the healthcare system and the requirement that she do so much over the computer, which triggered some of her pain symptoms. (R. 833); saying she felt "incompetence and failure" due to her inability to work and function as she did in the past. (R. 834). On December 14, 2015, plaintiff's mental healthcare provider opined that she had extreme limitations in activities of daily living, social functioning, and maintaining concentration. (R. 859).

**B.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert and a medical expert, the ALJ determined the plaintiff had the following severe impairments: scoliosis (status post corrective surgery), cervical degenerative disc disease, carpal tunnel syndrome, peripheral neuropathy, depressive disorder, and somatoform disorder. (R. 869). The ALJ judged plaintiff's additional impairments – anemia, plantar fasciitis, and fibromyalgia – to be non-severe. (R. 869). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered the requirements for the Listings covering disorders of the spine (1.04), peripheral neuropathy (11.14), depressive disorders (12.04), and somatoform disorders (12.07). (R. 869). In understanding, remembering, or applying information and interacting with others, the ALJ found the plaintiff had no more than mild limitations. In concentrating, persisting, or maintaining pace, the ALJ found the plaintiff had a moderate limitation. (R. 870-71).

8

The ALJ then determined that, prior to June 25, 2017, the plaintiff could perform light work with the following limitations: she was limited to occasional pushing and pulling; occasional climbing of ladders, ropes, or scaffolds; occasional handling bilaterally; frequent feeling bilaterally; occasional overhead reaching bilaterally; occasional exposure to vibration. The ALJ further found that the plaintiff retained the capacity to understand, remember, concentrate persist and perform simple, routine, repetitive tasks in a low-stress environment, involving simple work-related decisions and routine changes in the work setting. The work could not be fast-paced, and plaintiff would have to meet end of day quotas. The ALJ added that plaintiff would need a break every two hours for fifteen minutes, which was no different than routine breaks and lunch. (R. 870-71).[3]

The ALJ then reviewed plaintiff's allegations and activities. She then found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported prior to June 25, 2017, for the reasons explained in this decision." (R. 872). The ALJ summarized the medical evidence, focusing on findings that were, in the main, "normal" or "fairly normal" or "good" or "mild." (R. 873-75).

_____

[3] The RFC finding from the plaintiff's previous trip through the administrative process was that plaintiff could perform light work but:

> would require a job that could accommodate the need to change positions between sitting and standing at will. The [plaintiff] would be able to engage in unlimited balancing and stooping, but would be limited to occasionally crawling, crouching, and climbing ramps and stairs. The [plaintiff] would be unable to climb ladders, ropes, or scaffolds, and she would be limited to frequent fingering and handling with her bilateral upper extremities. The [plaintiff] would be limited to simple routine tasks, with only occasional decision making and only occasional changes in the work setting. (R. )

So, in the remand, plaintiff lost some ground, as it were. She no longer has the option to change positions at will, and she lost the restriction against climbing ropes, ladders, and scaffolds.

9

As for medical opinions, the ALJ gave little weight to a report from a physical therapist that plaintiff was limited to just 15 minutes of standing or sitting, because there was no support for a limitation of that degree. (R. 875). The ALJ gave the opinions from the state agency reviewing physicians significant to moderate weight, rejecting the limitation to one or two step tasks as overly restrictive in view of plaintiff's activities. The ALJ also gave little weight to the report from plaintiff's treating physician regarding her extreme limitations in mental functioning as they were inconsistent with predominantly normal exam records. But he gave moderate weight to the doctor's opinion that plaintiff's concentration was compromised. (R. 876).

The ALJ then found that, beginning June 25, 2017, the plaintiff was limited to sedentary work, along with the previous laundry list of additional limitations. (R. 877). The ALJ explained that a CT scan on June 24, 2017 showed cervical spine straightening with multilevel degenerative spondylosis and mild disc bulges, as well as decreased disc height at C5-6. Furthermore, an x-ray in November 2017 showed moderate disc disease and mild neuroforiminal narrowing at C5-6. (R. 877).

Next, the ALJ, relying on the testimony of the vocational expert, found that, prior to June 25, 2017, plaintiff could not perform her past relevant work, but could perform other work that existed in significant numbers in the national economy. An example of such work was: Furniture Rental Consultant (DOT 295.357-018; 300,000 jobs). (R. 879). Accordingly, the ALJ found plaintiff not disabled prior to June 25, 2017, and not entitled to benefits under the Act. (R. 879-80).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance.

10

See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The substantial evidence standard is a low hurdle to negotiate. *Biestek*, 139 S. Ct. at 1154; *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). If reasonable minds could differ, the court must defer to the ALJ's weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). But, in the Seventh Circuit, the ALJ also has an obligation to build an "accurate and logical bridge" between the evidence and the result so as to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is

enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Of course, this is a subjective standard: one reader's Mackinac Bridge is another's rickety rope and rotting wood nightmare. The subjectivity of the requirement makes it difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged. But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). Here, however, the court is unable to do that. As it happens, this is a case with logical bridge problems.

## III.

### A.

It is often said that courts are to take a common-sense approach to reviewing an ALJ's decision. *See, e.g., Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). And we do so here. The plaintiff has had scoliosis – and a rod implanted into her spine – since childhood. Yet, she has worked for three decades in desk jobs, mostly accounting, and has little or no experience with physical labor. At 54 – at the time of the ALJ's decision; she is 58 now – she was what the Commissioner categorizes as "closely approaching advanced age," see 20 C.F.R. § 404.1563. Along with her lifelong scoliosis and whatever issues it – and perhaps the Harrington rods – may be causing, objective studies show that she suffers from spondylosis at C3-C4; moderate, chronic disc

disease and moderate decrease of vertebral space at C5-C6; straightening of the lordotic curve and significant reversal of cervical lordosis; moderate degenerative changes throughout the lumbar spine; moderate scoliosis in the dorsal and lumbar spine with the upper convexity toward the right and a compensatory lower convexity in the lumbar region extending toward the left. (R. R. 302, 469, 537). Now, given that, does common sense suggest that this 54-year-old lady can climb ropes and scaffolds for up to one third of every workday?[4]  The obvious answer is "no."  And it seems a bit of a stretch that she can perform light work – standing and walking up to six hours a day, lifting and carrying up to 20 pounds – without any more than ordinary breaks.[5]

Given that evidence, the court might have been able to buy a finding that plaintiff could perform sedentary work, especially with a sit/stand option.  Indeed, that's what the ALJ found plaintiff limited to as of June 25, 2017.  According to the ALJ, the plaintiff was limited to sedentary work with multiple postural, manipulative, environmental, and mental limitations beginning on June 25, 2017, based on a CT scan from June 24, 2017, showing cervical spine *straightening* with multilevel degenerative *spondylosis* and mild disc bulges, as well as decreased disc height at C5-6,

---

[4] These types of RFC findings always tend to recall the Seventh Circuit's criticism of such "accommodations" in *Goins v. Colvin*, 764 F.3d 677, 682 (7th Cir. 2014).

[5] The plaintiff lost a lot of ground from her first trip through the administrative process to her second. The ALJ's previous residual functional capacity finding was that plaintiff could perform light work but:

> would require a job that could accommodate the need to change positions between sitting and standing at will.  The [plaintiff] would be able to engage in unlimited balancing and stooping, but would be limited to occasionally crawling, crouching, and climbing ramps and stairs.  The [plaintiff] would be unable to climb ladders, ropes, or scaffolds, and she would be limited to frequent fingering and handling with her bilateral upper extremities. The [plaintiff] would be limited to simple routine tasks, with only occasional decision making and only occasional changes in the work setting. (R. 948)

So, somehow, plaintiff no longer has the option to change positions at will, and she lost the restriction against climbing ropes, ladders, and scaffolds.

and an x-ray from November 2017 showing *moderate* disc disease and mild neuroforiminal narrowing at C5-6. (R. 877). There's another "logical bridge" problem here, however, as the medical evidence in the years prior to June 2017 show similar degrees of impairment. As the plaintiff argues, a cervical spine imaging report from September 6, 2012, showed significant *reversal of the normal cervical lordosis*, *moderate* decrease of the intervertebral disc space at C5-6, and *spondylosis* at C3-4 and C5-6. (R. 302). In addition, plaintiff's treating physician, Dr. Savage, stated that plaintiff had *moderate* degenerative disc disease at C5-C6 in September 2013 (R 537-38). And there was evidence of *moderate* scoliosis in the dorsal and lumbar spine with the upper convexity toward the right, a compensatory lower convexity in the lumbar region extending toward the left in July 2013. (R. 470). So there is evidence of spinal impairments – reversal of lordosis, scoliosis, and moderate disc disease – to similar degrees in studies from both time periods. The question is, why do the studies before June 2017 allow plaintiff to perform light work (including climbing ropes), while similar studies after June 2017 limit her to sedentary work (resulting in a finding of disability)? Unfortunately, but not surprisingly, the ALJ offered no explanation. (R. 877).

### B.

All that is before one even gets to the evidence regarding plaintiff's depression. There is a lot of it. As already noted, there are four years' worth of treatment records that go into details beyond what is normally seen in these records – such as "mood depressed, affect flat" – and do not offer a very positive picture at all. The parties agreed to a remand in this case mainly for the ALJ to consider limitations stemming from plaintiff's somatoform disorder. (R. 983). Somatoform disorders cause "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.07; *Carradine v.*

14

*Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004). Here, the plaintiff has significant physical impairments – demonstrable organic findings – but doctors feel her somatoform disorder results in symptoms and greater pain that go beyond what can be explained by her physical impairments. As the Seventh Circuit has explained:

> The question whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels. The pain is genuine in the first, the psychiatric case, though fabricated in the second. The cases involving somatization recognize this distinction. *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir.1995); *Latham v. Shalala*, supra, 36 F.3d at 484; *Easter v. Bowen*, supra, 867 F.2d at 1129.

*Carradine*, 360 F.3d at 754–55. Here, the medical evidence suggests – at the very least – that plaintiff's pain leads to her depression, which exacerbates her pain which she cannot find a medical treatment for, despite her extensive efforts. That leads to frustration and, again, depression. But the ALJ appeared to improperly compartmentalize plaintiff's physical symptoms from her mental impairment. (R. 874). An ALJ must consider the combined effects of a plaintiff's impairments in every case,

Here the ALJ seemed to completely lose sight of what a somatoform disorder is, with interplay between mental and physical symptoms. For example, at one point, the ALJ said that plaintiff's:

> back and nerve pain has not been shown by the objective medical evidence to warrant physical limitations beyond those set forth in the residual functional capacity . . . . A more restrictive finding is not supported, as the objective evidence reflects relatively benign clinical exam findings related to [plaintiff's] functioning.

(R. 874). Lack of objective findings to support the extent of a patient's symptoms is, as already noted, a hallmark of somatoform disorder. At another point, the ALJ seemed to write off plaintiff's depression as a preoccupation with her physical impairments, saying that her "mental status exams were normal apart from sadness and a preoccupation with her physical condition." (R. 876). Again,

15

this ignores the interplay between and exacerbation of mental and physical symptoms in the case of somatoform disorder.

All this is arguably documented in the extensive treatment records, but here's what the ALJ had to say about those records:

> The undersigned notes the record contains mental health treatment notes from Metropolitan Family services spanning 2014 through 2018.

(R. 875). The ALJ did not give examples of those notes or even summarize them. That's remarkable, given the ALJ was supposed to delve into plaintiff's somatoform disorder on remand. As already explained, whether it's called a "logical bridge" or a "minimal articulation", an ALJ's opinion must "assure[] us that the ALJ considered the important evidence . . . ." *Stephens*, 766 F.2d at 287-88; *see also Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021)(". . . '[a]lthough the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.'"); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (". . . while an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability."). The ALJ's opinion assures the court of no such thing, and the error of articulation here is exacerbated by the fact that the casually dismissed records are exactly the type of evidence the ALJ was to grapple with on remand.

## C.

Even without considering that evidence, the ALJ found that plaintiff was moderately limited in her ability to concentrate, persist, and maintain pace. This, she translated into a restriction to an ability to perform simple, routine, repetitive tasks in a low-stress environment; work which was not fast-paced and would permit a break every two hours that can be accommodated by routine breaks

and lunch.  (R. 871, 877).  The ALJ didn't mention plaintiff's concentration limitations to the vocational expert in her hypothetical at the hearing.  (R. 924-25).  So, the question –as it so very often is in these cases – is, did the ALJ adequately account for the moderate limitation in concentration, persistence, and pace ("CPP") with the limitations to simple, routine, repetitive tasks and no fast-paced work?

Obviously, the best and easiest thing to do would be to simply include the moderate restriction in the hypothetical.  *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).  But the Seventh Circuit has steadfastly refused to require any specific phrasing in CPP case after CPP case, *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021); *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *Winsted*, 923 F.3d at 477, and ALJs never mention moderate restrictions in their hypotheticals. The guidance on how to assess those "less than ideal" hypotheticals has been somewhat nebulous.  On the one hand we are told that "there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace." *DeCamp v. Berryhill*, 916 F.3d 671, 675–76 (7th Cir. 2019); *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016).  But, in other cases, the court has found that a plaintiff with a moderate restriction on concentration, persistence, and pace can perform simple, repetitive work. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019); *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (claimant with deficiencies in concentration, persistence, or pace can perform semiskilled work); *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002) (claimant with moderate limitations in concentration, persistence, or pace can perform "simple and repetitive light work"). And, more specifically, the court has found it acceptable for an ALJ to translate a moderate restriction into a quota or pace limitation where the ALJ draws it from the

17

narrative assessment of a doctor. *See, e.g., Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *Baldwin v. Berryhill*, 746 F. App'x 580, 584 (7th Cir. 2018). That's the line of reasoning the Seventh Circuit accepted not long ago in *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021), where the court found "substantial evidence support[ed] the ALJ's conclusion that the restrictions in the hypothetical question adequately addressed [plaintiff's] "moderate" limitations in concentration, persistence, and pace [because t]he question included the same restrictions that [state agency reviewing doctors] stated would accommodate [plaintiff's] limitations." 994 F.3d at 784. But here, the ALJ rejected the state agency reviewing psychologist's restriction to one-to-two-step tasks and crafted an RFC and hypothetical of her own. (R. 876). As such, it is untethered to the medical record, especially given the ALJ's rather cavalier dismissal of four years' worth of treatment records.

## D.

Accordingly, this case must again be remanded, which is extremely unfortunate given the age – of these proceedings. The only saving grace is that plaintiff has at least been receiving benefits based on her disabled status as of June 2017. The court acknowledges that the plaintiff asks for an award of benefits, but "an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Allord v. Astrue*, 631 F.3d 411, 417 (7th Cir. 2011). As the remand here comes under the Seventh Circuit's "logical bridge" requirement, an award of benefits is not appropriate without further administrative proceedings. Of course, there is no regulation – at least none that the court is aware of – that precludes the parties compromising on an onset date somewhere between what the plaintiff is arguing for and June 2017. But, that choice is left to the parties. *See, e.g., Biondo v. City of Chicago, Ill*, 382 F.3d 680, 692 (7th Cir. 2004)("Perhaps what we have said will lead the litigants to resolve these remaining issues (and the

remaining . . . claims) amicably rather than slug it out again in the courtroom.  We hope so; this dispute is approaching its [second] decade.")

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment [Dkt. # 14] is granted, the defendant's motion for summary judgment [Dkt. #22] is denied, and this matter is remanded to the Commissioner for further proceedings.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 2/4/22

19